IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| ARTHUR M.[1], | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )  Civil Action No. 7:20-cv-293 |
| | ) |
| KILOLO KIJAKAZI[2], | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| **Defendant.** | ) |

## REPORT AND RECOMMENDATION

Plaintiff Arthur M. ("Arthur") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding him not disabled and therefore ineligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. Arthur alleges that the ALJ erred by failing to: (1) find that his intellectual disability met a listing; (2) properly assess his mental impairments; and (3) properly assess his allegations.

I conclude that substantial evidence does not support the Commissioner's decision that Arthur's intellectual disability did not meet a listing. I also conclude there was an apparent conflict between the vocational expert's testimony and the Dictionary of Occupational Titles ("DOT"), which was never explained. Accordingly, I **RECOMMEND GRANTING** Arthur's

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is hereby substituted for Andrew Saul as the defendant in this case.

Motion for Summary Judgment in part (Dkt. No. 15) and **DENYING** the Commissioner's Motion for Summary Judgment. (Dkt. No. 17).

## STANDARD OF REVIEW

This court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Arthur failed to demonstrate that he was disabled under the Act.[3] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); see also Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Mastro, 270 F.3d at 176 (quoting Craig v. Chater, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). "The inquiry, as is usually true in determining the substantiality of evidence, is case-by-case." Biestek, 139 S. Ct. 1148. The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th

---

[3] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Cir. 1990).

However, remand is appropriate if the ALJ's analysis is so deficient that it "frustrate[s] meaningful review." Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015) (noting that "remand is necessary" because the court is "left to guess [at] how the ALJ arrived at his conclusions"); see also Monroe v. Colvin, 826 F.3d. 176, 189 (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and if so, how often) (citation omitted).

## CLAIM HISTORY

Arthur filed for DIB in October 2015, claiming that his disability began on July 1, 2003 due to intellectual disability, illiteracy, inability to tell time unless using a digital clock, inability to make change above $20.00, migraines, depression, acid reflux, and constipation. R. 195, 199. Arthur's date last insured was September 30, 2008.[4] R. 15, 229. Thus, he must show that his disability began on or before this date and existed for twelve continuous months to receive DIB. 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). The state agency denied Arthur's applications at the initial and reconsideration levels of administrative review, both citing insufficient evidence to adjudicate the claim. 73–79, 81–87. On September 12, 2018, ALJ David S. Lewandowski held a hearing to consider Arthur's claim for DIB. R. 33–72. Counsel represented Arthur at the hearing, which included testimony from vocational expert Asheley Wells.

---

[4] Arthur was 42 years old on his date last insured, which is defined as a younger person under the Act. R. 26, 81. He was 52 years old on the date of the ALJ's opinion.

On February 6, 2019, the ALJ entered his decision analyzing Arthur's claims under the familiar five-step process[5] and denying his claim for benefits. R. 15–27. The ALJ found that Arthur was insured at the time of the alleged disability onset and that he suffered from the severe impairment of intellectual disability.[6] R. 17. The ALJ determined that this impairment, either individually or in combination with other impairments, did not meet or medically equal a listed impairment, specifically listing 12.05 (intellectual disorder). The ALJ found that regarding his mental impairment, Arthur had moderate limitations in understanding, remembering, or applying information, interacting with others, concentration, persistence, or pace, and mild limitation in adapting or managing oneself. R. 20.

The ALJ concluded that, through the date last insured, Arthur retained the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with certain nonexertional limitations. R. 20–21. Specifically, Arthur could understand, remember, and carry out simple one-or-two step instructions and perform simple, routine, repetitive tasks. He could have only occasional interaction with coworkers and supervisors, and no interaction with the public, could perform only work that is directed, and could not make plans independently. Arthur could not perform work with any reading, writing, or math requirements,

---

[5] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

[6] The ALJ determined that Arthur's "significant gastrointestinal problems" developed after the date last insured. R. 17. The ALJ noted that, the "only evidence of medical treatment before the date last insured is for allergic rhinitis" which was non-severe. R. 17.

and could not work with money. He could only perform jobs where he learns by demonstration. The ALJ determined that Arthur could perform his past relevant work as a dining room attendant and floor maintenance worker; however, the ALJ misclassified Arthur's supermarket meat department job as a floor maintenance worker, when the vocational expert ultimately identified it at the hearing as an industrial cleaner.[7] R. 67–68.  The ALJ also determined that Arthur could perform other jobs that exist in significant numbers in the national economy, such as hand packer, laundry worker, and dishwasher. R. 25–26.  Thus, the ALJ concluded that Arthur was not disabled through September 30, 2008, the date last insured. Arthur appealed the ALJ's decision and the Appeals Council denied his request for review on April 13, 2020. R. 1–3.

## ANALYSIS

### A.  Medical / Education History and Opinions

Arthur's alleged onset date was in 2003, almost 20 years ago, and his date last insured was in 2008, more than ten years ago. As noted by the ALJ, while Arthur now has various significant gastrointestinal problems, including requiring a feeding tube, during the period prior to the date last insured his only medical treatment was for allergic rhinitis. R. 480. Similarly, while the record does contain his school records from the period 1976–1981, there is no evidence regarding Arthur's intellectual functioning during the period between his alleged

---

[7] The exchange went as follows:

ALJ: The job at the supermarket, the meat department –
VE: Yes, that's –
ALJ: – that's a floor maintenance worker?
VE: Yes. He's cleaning up, right?
ALJ: But he's cleaning up more than –you know, he's cleaning up the band saws, and putting meats away, and –
VE: He's cleaning up. It's tantamount to an industrial cleaner.

R. 68.

onset date and date last insured. R. 22–23, 252–363. Arthur was recommended for special education in early elementary school, but his father would not sign the required paperwork. R. 271– 273. In grade six, he was placed in a "self contained class for the educable mentally retarded." R. 275–76. He left school after the seventh grade, but his reading and math were only at the first and second grade level. R. 305–309, 365. The ALJ found Arthur's school records "less relevant" noting they end approximately 22 years before his alleged onset date, and that his functioning may have changed as he entered adulthood. R. 22. However, even at age 48, Dr. Luckett found Arthur's spelling, reading, and math skills were still at the first and second grade level. R. 364, 368.

Jeffrey B. Luckett, Ph.D., performed a consultative exam on April 14, 2014. R. 364–69. Dr. Luckett assessed him with mild mental retardation, and noted that he would not be capable of making his own financial decisions due to his "lower IQ." R. 369. Dr. Luckett, referencing Arthur's work history, including working over 15 years as a busboy, noted he "appear[s] to [have] some abilities beyond strictly looking at his Full Scale IQ." R. 369. Dr. Luckett indicated Arthur could perform only simple and repetitive tasks, and would not work well with the general public, but could work with peers and supervisors. Id. Dr. Luckett found Arthur not capable of living independently, due to his "low logic and reasoning abilities" including not being able to handle money or understand concepts well.[8] Id. A Wide Range Achievement Test showed Arthur's current reading and math abilities at the second grade level, with spelling abilities at the first grade level. R. 368. The ALJ gave Dr. Luckett's opinion significant weight, noting he was "the only psychologist to evaluate [Arthur] as an adult." R. 24.

---

[8] Arthur has always lived with his parents. His father has passed away, and he currently lives with his mother, who suffers from Parkinson's disease. R. 369.

6

State agency doctors also reviewed the record, however, they offered no specific opinion, as they found there was insufficient evidence to properly adjudicate the claim prior the date last insured.

**B. Listing 12.05B[9]**

Arthur argues that the ALJ erred in finding that he did not satisfy the requirements of listing 12.05(B), as he has a full scale IQ score below 70 as well as significant deficits in adaptive functioning.[10] Specifically, Arthur challenged the ALJ's findings that he had only moderate and mild limitations in the areas of mental functioning, arguing he has marked limitations in three of the areas, understanding, remembering, or applying information, concentrating, persisting or maintaining pace, and adapting or managing himself.[11]

Listing 12.05B[12] requires a showing of:

1) Significantly subaverage general intellectual functioning, evidenced by a full scale IQ score of 70 or below on an individually administered standardized test of general intelligence[13]; and

---

[9] In the Listings of Impairments, "[e]ach impairment is defined in terms of several specific medial signs, symptoms, or laboratory test results." Sullivan v. Zebley, 493 U.S. 521, 530 (1990). A claimant is presumed to be disabled if his or her impairment meets or is medically equivalent to the criteria of an impairment set forth in the Listings. See 20 C.F.R. § 416.925.

[10] Arthur provides no argument regarding whether the ALJ erred in finding he also did not meet listing 12.05A. Likewise, the Commissioner notes 12.105A "is not relevant" here because it requires an inability to participate in standardized testing of intellectual functioning, which does not apply to Arthur, who did participate in IQ testing. Pl.'s Br. at 9, D's Br. at n. 3. Accordingly, I need not address listing 12.05A.

[11] Arthur did not argue that the ALJ should have found marked limitations in interacting with others. In this area of mental functioning, the ALJ found moderate limitations, noting Arthur had worked around coworkers and supervisors during his three long term jobs, with no reported problems getting along with people, except for a single incident "when he said some things he should not" after being fired. R. 19. Though he can go out in public, and ask store associates for help locating items, the ALJ still limited work with the public, as he found Arthur's low intellectual functioning might lead to him feeling "overwhelmed" if asked about "complex matters." Id.

[12] Effective January 17, 2017, the Commissioner significantly altered the listings for mental disorders and, among other things, removed Listing 12.05(C). Kiser v. Saul, 821 F. App'x 211, 216 (4th Cir. 2020).

[13] The significantly subaverage general intellectual functioning can also be shown by a full scale IQ score of 71–75, along with a verbal or performance IQ score of 70 or below.

2) Significant deficits in adaptive functioning evidenced by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:
   a. Understand, remember, or apply information;
   b. Interact with others;
   c. Concentrate, persist, or maintain pace; or
   d. Adapt or manage oneself; and

3) The evidence about your current intellectual and adaptive functioning and the history of your disorder demonstrates or supports the conclusion that the disorder began prior to age 22.

See 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.05B. The ALJ acknowledged that Arthur had a full scale IQ of 63, but found the requirements of listing 12.05(B) unmet because Arthur did not have an extreme limitation in one, or marked limitation in two, of the areas of adaptive functioning.[14] R. 19–20. The ALJ failed to specifically discuss whether the evidence supported a conclusion that the disorder began prior to age 22.

"Adaptive functioning" means how a person "learn[s] and use[s] conceptual, social, and practical skills in dealing with common life demands," including his "typical functioning at home and in the community, alone or among others." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(H)(3)(a). The ALJ provided an overview of each area of mental functioning, followed by a discussion leaning heavily on the fact that Arthur had been able to work "at three different jobs for many years" and also citing occasionally to Dr. Luckett's report. R. 19. The ALJ did not discuss Arthur's school records in this section.

In finding moderate limitations in understanding, remembering, or applying information, the ALJ noted Arthur showed some memory difficulties during his consultative examination with Dr. Luckett, but was "generally able to remember simple items." R. 19. Specifically, he could

---

[14] A "mild limitation" means functioning is "slightly limited," a "moderate limitation" means functioning is "fair," a "marked limitation" means functioning is "seriously limited," and an "extreme limitation" means an inability to function. 20 C.F.R. § 404, subpt. P, app. 1.

8

recite digits forwards and backwards, and, despite his intellectual disability and low IQ had reported working three different jobs for years, including understanding, remembering, and carrying out instructions for various tasks at these jobs.[15] Id. The ALJ, however, did not discuss that in the Wechsler Adult Intelligence Scale, administered by Dr. Luckett, Arthur was in the "mentally deficient range" for working memory and verbal comprehension. R. 367. Dr. Luckett noted Arthur's use of judgment, logic, and reasoning were below average, and he has difficulty with mental reasoning. R. 366. These findings conflict with the skills including "ability to learn, recall, and use information" and "identify and solve problems and use reason and judgment to make decisions" considered in this section.

In finding moderate limitation in concentration, persistence, or pace, the ALJ acknowledged that Arthur's low intellectual functioning would make concentration on detailed or complex matters difficult. R. 20. However, the ALJ emphasized that Arthur had reported no difficulty with staying on task and maintaining pace at his past jobs, both before and after his alleged onset date, and could concentrate adequately to complete the intelligence and other testing during his consultative exam with Dr. Luckett. The ALJ attributed his mistakes on serial threes and other calculations "to his low math skills rather than concentration problems." R. 20. However, there is no clear support for this conclusion in the record, as an individual can certainly have both low math skills and concentration issues. Indeed, when Dr. Luckett gave Arthur three numbers to remember, and then asked him to count to ten as a distraction, Arthur was unable to recite the numbers. R. 367.  Additionally, Dr. Luckett's testing revealed a processing speed in the borderline range. Id.

---

[15] Arthur reported working at Peaks of Otter Lodge as a busboy for 15 to 20 years, as a janitor at Read Mountain Middle School for one year, and at the IGA cleaning the meat department for three to four years. R. 365.

The ALJ found a mild limitation in adapting or managing oneself, noting that Dr. Luckett indicated "no deficiencies in hygiene" or clothing, and that, though he lived with his mother who managed his money, he otherwise performed his own activities of daily living, chores, and shopping. R. 20. The ALJ also indicated that Arthur "cared for his elderly mother, who had Parkinson's disease." Id. This is a clear overstatement of Arthur's abilities by the ALJ, as Dr. Luckett specifically found Arthur incapable of living independently due to "low reasoning abilities and inability to handle money well." R. 24. Indeed, the ALJ acknowledged that Arthur had never lived alone (R. 20, 22, 24) and even concluded that Dr. Luckett's opinion that Arthur would always need to live with a family member was "generally consistent with the evidence in the record." R. 24. The ALJ's determination that this part of the opinion "is less relevant to [Arthur's] ability to work" is unsatisfactory, as it does not explain the potential impact that an inability to live alone, due to low reasoning and IQ, could have on the ability to handle full time work. The ALJ only states that, "A person does not need to perform all activities of independent living (which includes some complex tasks, reading, and math) successfully in order to do simple routine work. R. 24.

The ALJ also placed undue emphasis on Arthur's work history, especially considering conflicting evidence in the record regarding whether he received special accommodations, both for obtaining and performing these jobs. Arthur states in his brief that his past jobs "were obtained through the benevolence of friends who did not penalize him for mistakes and errors and when those friends left [the] place of employment, [he] was terminated." Pl.'s Br. at 12, Dkt. 16. There is conflicting evidence in the record regarding this, which was not clearly resolved by the ALJ. Arthur testified that the same individual got him a job at both Peaks of Otter and the IGA supermarket. R. 40. Later, in response to questioning from counsel, Arthur confirmed that

10

he got each of the three jobs because of family friends or relatives that worked at those locations. R. 55. Arthur did appear to believe he received no special accommodations in actually performing the jobs. However, he also stated that when the family friend or relative that hired him left, at both Peaks of Otter and IGA, he was fired. R. 40–41. Further, his sister indicated he was fired from his job as a school janitor after a year because he hugged the children. Arthur also testified that he could not fill out any forms or paperwork, stating "if there a form . . . ain't no way I know what to do on there." R. 60.

The fact that Arthur "engaged in work activity, or that he work[ed] intermittently or steadily in a job commensurate with [his] abilities, will not always mean that he do[es] not have" serious "deficits in adaptive functioning," 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(H)(3)(e). Rather, the ALJ should have "consider[ed] all factors involved in his work history," including "the reason the work ended," before reaching "any conclusions about [his] adaptive functioning." Id. § 12.00(H)(3)(e). Courts have found that a claimant's ability to perform "clearly unskilled work" alone is not substantial evidence in support of an ALJ's finding that the plaintiff lacked deficits in adaptive functioning. See Johnson v. Berryhill, No. CV 6:16-2669, 2017 WL 1653248, at *7 (D.S.C. Apr. 13, 2017), report and recommendation adopted, No. CV 6:16-2669, 2017 WL 1592428 (D.S.C. Apr. 28, 2017) (rejecting that ALJ's conclusion that the "plaintiff's ability 'to work successfully for 8 years' and 'to maintain a job with the same employer [Big Lots] for 5 years' evidenced that she had no deficits in adaptive functioning). In another section of the opinion, the ALJ wrote that Arthur "testified that he cannot hold a job now due to his stomach issues that developed in 2017," characterizing Arthur's statements as "if it wasn't for his stomach problems, he thinks he could hold a job, but he is not sure because it has been awhile since he worked." R. 22. This overstates Arthur's testimony, when, at the hearing, the ALJ asked

11

Arthur, a man with the severe impairment of intellectual disability, *multiple* times if he thought he could hold a job now, until Arthur changed his answer:

> ALJ: Do you think you could hold a job right now
>
> A: I doubt if I could deal with anything.
>
> ALJ: Okay. But other than [your stomach problems] do you think you'd be able to hold a job?
>
> A: I don't think I can.
>
> ALJ: Okay. If it wasn't for your stomach problems do you think you'd be able to hold a job?
>
> A: I probably could but I don't know if I could or not . . . It's been so long since I worked, you know, I wouldn't know what to do with all these new stuff they got and I don't know nothing about that.

R. 51–52.

Further, Arthur's school records, which the ALJ does not discuss as part of his listing analysis, show he completed school only through the seventh grade, in special education, but with a reading and math level of first or second grade. In grade six, he needed one on one help with every subject, and was placed in a "self contained class for the educable mentally retarded." R. 275–76. Significantly, even at age 48, the consultative examination showed his spelling, math, and reading level were still at first or second grade. R. 364. Indeed, Arthur cites to his school records and the consultative examination, including that he only attended school through the seventh grade, never obtained a GED, and "has a limited ability to read and write" as support for his argument that his current intellectual functioning began prior to age 22. The ALJ's opinion, however, does not explicitly address this prong of listing 12.05B. The ALJ acknowledged that the consultative examination and the school records show Arthur "had a serious lifelong intellectual disability, even though he did not get testing or treatment for it during the period at

issue." R. 24. However, the ALJ states this in the context of discussing the opinions of the state agency doctors, and also states he finds the school records "less relevant" because they predate the alleged onset date by so many years. In fact, in analyzing areas of mental functioning related to listing 12.05 the ALJ never even discussed Arthur's school records or his adaptive functioning prior to age 22. Thus, I am left to guess regarding the ALJ's reasoning regarding this prong. The ALJ's failure to discuss this evidence, as well as consider other conflicting evidence, is error and I find that the ALJ's conclusions that Arthur did not meet listing 12.05B is not supported by substantial evidence.

### C. Apparent Conflict with the DOT

Remand is also appropriate because there is apparent conflict between the vocational expert's testimony and the Dictionary of Occupation Titles, which was never explained. In determining Arthur's ability to perform his past relevant work as a dining room attendant and industrial cleaner, as well as other work in the national economy, including hand packer, laundry worker, and dishwasher, the ALJ relied on the testimony of the vocational expert.[16] R. 25–26. However, these jobs exceeded Arthur's RFC and were inconsistent with the ALJ's hypothetical, which specifically limited Arthur to jobs that had no reading, writing, or math requirements.[17] The DOT lists the jobs stated by the vocational expert as math and language level one, except for cleaner, industrial, which is language level two. Math level one requires the following:

> Add and subtract two-digit numbers. Multiply and divide 10's and 100's by 2, 3, 4, 5. Perform the four basic arithmetic operations with coins as part of a dollar. Perform operations with units such as cup, pint, and quart; inch, foot, and yard; and ounce and pound.

---

[16] The jobs are listed in the DOT as follows: Packager, Hand DICOT 920.587-018 ; Laundry Worker, Domestic, DICOT 302.685-010 ; Kitchen Helper, DICOT 318.687-010 ; Dining Room Attendant, DICOT 311.677-018 ; Cleaner, Industrial, DICOT 381.687-018.

[17] Although Arthur did not raise this issue in his allegations of error, I address it so it may be considered in the event this case is remanded, along with his other allegations of error.

Language level one requires:

>    READING: Recognize meaning of 2,500 (two- or three-syllable) words. Read at rate of 95-120 words per minute. Compare similarities and differences between words and between series of numbers.
>    WRITING: Print simple sentences containing subject, verb, and object, and series of numbers, names, and addresses.

Language level two requires:

>    READING: Passive vocabulary of 5,000-6,000 words. Read at rate of 190-215 words per minute. Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation. Read instructions for assembling model cars and airplanes.
>
>    WRITING: Write compound and complex sentences, using cursive style, proper end punctuation, and employing adjectives and adverbs.

Thus, the jobs listed by the vocational expert all appear to require reading, writing, and math. However, the vocational expert never addressed this conflict. The vocational expert did specifically confirm that, while the DOT does not address the inability to handle routine changes, and, thus, that information was based on her professional experience, "a reading, writing, and math requirement" are part of the DOT and that her testimony was consistent with the DOT. R. 69–70.

Social Security Ruling ("SSR") 00–4p provides that the ALJ "has an affirmative responsibility to ask [the vocational expert] about any possible conflict between [his] evidence and . . . the DOT." SSR 00–4p, 2000 WL 1898704, at *4 (Dec. 4, 2000). The ALJ must resolve the conflict before relying on the expert's testimony and must explain the resolution of the conflict in his decision. Further, "an ALJ has an affirmative 'duty to make an independent identification of apparent conflicts' between [vocational expert] testimony and the provisions of the [DOT] regardless of whether a conflict is identified by the [vocational expert]." Dunivant v.

14

Saul, No. 2021 WL 620711, at *3 (M.D.N.C. Feb. 17, 2021) quoting Pearson v. Colvin, 810 F.3d 204, 208-09, 210 (4th Cir. 2015).

 Because the ALJ found that Arthur could not perform any work requiring reading, writing, or math, the jobs cited by the vocational expert are inconsistent with the hypothetical. I recognize that level one is the lowest classification in the DOT, and that a particular job may not require all of the level one skills. However, the vocational expert did not testify or explain to that effect. See SSR 00–04p ("When there is an apparent unresolved conflict between [vocational expert's] evidence and the DOT, the adjudicator must elicit a reasonable explanation to support a determination or decision about whether the claimant is disabled."); see also Pearson, 810 F.3d at 209 (confirming the ALJ's responsibility to fully develop the record in addressing apparent conflicts between a vocational expert's testimony and the DOT). I recognize that, while some courts have found a conflict between an RFC of no reading, writing, or math and the skills for level one jobs, other courts have found no conflict exists. Comp. Campbell v. Astrue, No. CA 808-02018, 2009 WL 2750080, at *2 (D.S.C. Aug. 25, 2009) (finding a conflict between and RFC of no reading, writing, or math and the job of table worker, which requires level one reasoning, math, and language skills") with Floyd v. Colvin, No. 2:14-CV-30, 2015 WL 4920264, at *5–6 (W.D.N.C. Aug. 18, 2015) (finding "a language level of one is the lowest language level in the DOT and is the appropriate language level for an individual who is limited to no reading"). Here, I find that, without any explanation by the vocational expert, I cannot assume that the jobs of dining room attendant, industrial cleaner, hand packer, laundry worker, and dishwasher, do not require any math, reading, or writing, when the DOT states they do. For example, the job description for hand packer indicates that a workers' duties can include labeling containers, sorting bundles and containers, inspecting materials, and recording information, such

15

as weight, time, and date packaged. See Packager, Hand, DICOT 920.587-018. These duties clearly conflict with an RFC of no writing or reading.

Here, there is ample evidence of Arthur's difficulties with math, reading, and writing. In response to the ALJ's questions on whether he could read and write in English, Arthur responded he could "read and write a little bit," but would not be able to read a newspaper, could not read the "hard words" in the letters from the Social Security Administration, and could not fill out any paperwork or forms. R. 37, 59. The ALJ asked, "Would you be able to read small, three or four letter words?" and Arthur responded, "Maybe, it depends what it is." R. 37. Further, he had to take an oral driving test, and was unable to pass the test for a GED. R. 36–37. Arthur also confirmed he could not read cursive, which conflicts with the writing skills required in language level two of the DOT. R. 22. Accordingly, substantial evidence does not support the ALJ's finding that there are jobs that Arthur can perform.

Because I find that remand is warranted based on the ALJ's failure to adequately explain why Arthur's intellectual disability did not meet a listing, and because I conclude there was an apparent conflict between a vocational expert's testimony and the DOT, which was never explained, Arthur's additional allegations of error will not be decided. See Boone v. Barnhart, 353 F.3d 203, 211 n.19 (3d Cir. 2003) (remanding on other grounds and declining to address claimant's additional arguments).

## CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that an order be entered **DENYING** defendant's motion for summary judgment, **GRANTING IN PART** plaintiff's motion for summary judgment, and **REMANDING** this case to the Commissioner.

The Clerk is directed to transmit the record in this case Michael F. Urbanski, United

States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objections, including the waiver of the right to appeal.

    Entered:  July 21, 2021

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge